UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

v.                                                                         **Case No. 5:78-cv-22-OC-20**
                                                                             **(Judge Schlesinger)**

**MARION COUNTY SCHOOL DISTRICT,
et al.,**

    **Defendants .**

_____/

## JUNE 8, 2005 ORDER

On May 23, 2005, this Court held an evidentiary hearing on its Order to Show Cause why Defendant, Marion County School District, should not be held in contempt (Doc. No. 170, filed on December 16, 2004). The Order was entered, in part, because the Plaintiff had filed a Motion to File its Report Out of Time (Doc. No. 168, filed on December 15, 2004), which mentioned its position that Marion County School District is in noncompliance with this Court's 2004 Modified Decree entered on August 31, 2004. With this request for another extension and allegations of the School District's continued noncompliance, the parties had pushed the Court's patience beyond breaking point regarding delays in this case.

At the hearing in May, the School District's expert witness, Dr. Christine H. Rossell, PhD, Associate Professor of Boston University, testified that the Order this Court entered on August 31, 2004 was one the most stringent, detailed orders that she has ever seen, setting forth restrictions and specific criteria for compliance with desegregation efforts to achieve a unitary status. First, by laying out a summary of the arduously lengthy, protracted, and winding path that this case has taken for

almost twenty-seven years, this Order will demonstrate what not only caused the Court to enter its Order to Show Cause in December, 2004, but also the reasons for entering its detailed 2004 Modified Decree.

The Plaintiff filed suit against the Marion County School District on May 23, 1978, pursuant to: Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d, et seq.; the implementing regulations of the U.S. Department of Education (then known as Health, Education & Welfare), 45 C.F.R. 80 and 81; the Fourteenth Amendment of the United States Constitution; and Defendants' contractual assurances in consideration of receiving federal financial assistance. The trial court's dismissal was appealed and reversed with a remand.

After the appellate court remanded the case in November, 1980 (Doc. No. 28), the case lay essentially dormant for almost two years, until the Plaintiff filed a Motion for Preliminary Injunction, or in the Alternative, a Motion for Summary Judgment on August 9, 1982 (Doc. No. 33). A few days later, the Plaintiff filed a Motion to Substitute Counsel, which was granted on August 16, 1982 (Doc. No. 37). The School District responded in September. On October 7, 1982, the Plaintiff filed its first of countless motions for leave to file out of time (Doc. No. 40), requesting an extension to file a reply, which was granted. During the spring and summer of 1983, the parties agreed upon a court-appointed expert, Dr. Christine Rossell, the same expert who recently testified in May 2005, to serve as a consultant in the case, and she filed a report. (See Doc. No. 55, Order Appointing, and Doc. No. 57, Expert's First Report, filed on November 10, 1983.)

By Order of December 22, 1983 (Doc. No. 62), the Court approved the parties' Stipulated Agreement which implemented a plan for further desegregation of the School District, and required the District to file semi-annual Hinds reports to the Court on various aspects of its desegregation

compliance. For the following ten years, the only activity in the case was the filing of the School District's Semi-Annual Reports.[1]

On November 16, 1993, the Court entered an Order requesting the parties to submit memoranda addressing whether the case should remain open. Following entry of this November 1993 Order, the Plaintiff undertook a thorough investigation to determine whether the School District had fully complied with the prior Orders of the Court and applicable federal law, and whether it should be declared unitary. In December, both parties filed motions for an extension of time to respond to the Order (Doc. No. 78, 80), which were granted. Marion County School District finally filed its

---

[1] As this Court previously related the history of this case in its Order entered on August 31, 2004, "[T]he 1983 Agreement required the School District, by the beginning of the 1985-86 school year, to convert de jure black Madison Street Primary and Howard Upper Elementary Schools (both with almost 100% black student enrollments) into magnet or special purpose facilities, and to open at least one K-5 magnet facility with an enrollment of 500, closely reflective of the district-wide student enrollment. The School District elected to open one K-5 magnet school at Madison Street Elementary, and to convert Howard Upper Elementary into a community and school district resource center. The approximately 350 black elementary students residing in the former Madison-Howard attendance area were reassigned among five predominantly white schools: Oakcrest, Wyomina Park, Ward-Highlands, South Ocala, and Eighth Street.
   In 1985, before the new magnet and special purpose facilities were fully operational, the School District reported its intention to undertake extensive new elementary school construction throughout the School District. The United States raised concerns about the potential impact of the School District's construction plans on district-wide elementary desegregation in light of Pitts v. Freeman, 755 F.2d 1423 (11th Cir. 1985), and the inequity of achieving the desegregation-related 500 student magnet enrollment at Madison Street by use of numerous relocatable classrooms, while simultaneously undertaking new permanent construction to relieve elementary overcrowding else-where in the District. The United States urged the School District to consider reprioritizing its proposed new elementary construction to more equitably fulfill the School District's obligations under the 1983 Order, either by construction of a permanent addition to the Madison Street magnet school, or by use of another facility as a magnet school.
   The School District moved relocatable classrooms to Madison Street to achieve the required 500 student enrollment. During the 1980's, the School District initiated an extensive new school construction program, funded largely by over $67 million in local bonds, which resulted in construction of ten (10) new elementary schools, two new middle schools, a new high school, and additions/renovations to several schools.
   In the early 1990's, the School District constructed a new College Park Elementary and a new Reddick-Collier Elementary for students in grades K - 5, and initiated plans to convert historically black Dr. N. H. Jones to a K - 5 magnet school, without the knowledge of the United States or the Court's approval. This action modified the voluntary desegregation agreement entered into with H.E.W. that had paired historically black Dr. N. H. Jones with historically white College Park, and historically black Collier with historically white Reddick . . . ."

3

Response to the November 16, 1993 Order on February 28, 1994[2] and the Plaintiff filed its Response on March 4, 1994, claiming for the first time that the School District was still not complying with its desegregation obligations implemented by the parties' Stipulated Agreement, which was approved by this Court's December 22, 1983 Order.[3] A Status Conference was held on July 26, 1994, whereby the Court entered an Order requiring the parties to file a proposed timetable for resolution of certain outstanding issues by August 15, 1994.

Once again, the School District asked for an extension, and the Court granted a short extension. The parties submitted a Joint Response setting forth an agreed-upon timetable for the development of specific remedial proposals and exchange of relevant data, but once again, the School District requested an extension to file its Interim Report from November 14, 1994 to November 30, 1994, which was granted.[4] On December 20, 1994, the Court entered an Order designating

---

[2] Without conceding liability, in its February 28, 1994 Response to the Court's Order, the School District agreed not to pursue dismissal at that time, and to attempt to resolve the desegregation concerns of the Plaintiff with the assistance of Dr. William M. Gordon, a desegregation expert retained for this purpose by the Plaintiff.

[3] The Plaintiff concluded, on the basis of its investigation, that continued judicial supervision was appropriate and identified several areas affecting school operation, consistent with Green v. County School Board of New Kent County, 391 U.S. 430, 435 (1968), in which the School District had not fully complied with its continuing desegregation obligations: (1) student assignment (including transfers); (2) faculty/staff hiring and assignment; (3) construction and location of new schools; (4) maintenance and improvements to existing schools with large minority enrollments; and (5) distribution of educational programs. Beginning in March 1994, with the cooperation of the School District, the Plaintiff' desegregation expert, Dr. Gordon, made several on-site visits to the School District, examined school facilities, met with school officials, parents, and interested citizens, and gathered and analyzed extensive desegregation data.

[4] Dr. Gordon's November 1994 Desegregation Report on Employment, submitted by - and attached to - the School District's Interim Report, found that there has been a decrease in minority School District employees in nearly every job category since the 1960's, and that the percentage of minority classroom teachers decreased from 33.6% of the teaching force in 1967-68, to 14.3% in 1993-94, in contrast to "the dramatic increase in both the number and percentage of white classroom teachers" over the same fifteen year period. The report further concluded that the School District's hiring and assignment practices have had a negative desegregative impact on employment. To remedy this, the November 1994 Desegregation Report included specific suggestions for employee recruitment, hiring, and assignment. The School District adopted many of Dr. Gordon's employment recommendations.

deadlines for memoranda from the parties detailing steps taken, or planned, to implement the reported recommendations of the desegregation expert, Dr. William Gordon, which was included in the Interim Reports that had been filed.[5]

Once again, a Motion for Extension of Time was filed by the Plaintiff (Doc. No. 100), requesting until the end of March 1995 (i.e., an additional month from the due date) to file its memorandum, which was granted. A Case Management and Scheduling Order was filed on March 29, 1995, setting this case for trial during the term commencing November 6, 1995, and directing the parties to file a pretrial stipulation. However, a trial was not necessary because a Stipulated Agreement was filed on July 11, 1995, and approved by the Court on September 29, 1995 (hereinafter, the "1995 Consent Agreement" - Doc. No. 110). It reflects the School District's ultimate adoption of many of Dr. Gordon's recommendations.

Again, between September, 1995 and September, 2003, Marion County School District merely filed Semi-Annual Status Reports and the Plaintiff remained essentially silent for those eight years. Consequently, this Court once again, scheduled a hearing to show cause why the case should not be closed. (Doc. No. 127, filed on September 29, 2003.) On January 23, 2004, the Plaintiff finally filed a responsive pleading with a Motion to enforce the 1995 Consent Agreement, claiming for the first time in almost ten years that the School District was still not complying with it.

---

[5] Per the parties' August 1994 Joint Response, after evaluating all of the relevant data, Dr. Gordon prepared and submitted to the School District two detailed desegregation reports. The expert's reports contain analyses of the relevant data, detailed remedial recommendations, and suggested policy changes. (Copies of Dr. Gordon's September and November 1994 desegregation reports were filed as Attachments A and B, respectively, to the Response of the Plaintiff to Marion County School District's November 30, 1994 Interim Report, filed on December 17, 1994.)

The September 1994 Desegregation Report concluded that the School District's policies and practices, particularly with respect to student assignment and maintenance and construction of school facilities, negatively impacted desegregation. Therefore, the report contains numerous remedial recommendations including several student assignment options and identification of necessary renovation and new construction.

After a hearing on January 29, 2004, the Court entered an Order (Doc. No. 132) setting February 13, 2004 as the deadline for the School District to file a response or asking for a determination of unitary status, setting a status conference for May 21, 2004, and setting an evidentiary hearing for June 7, 2004. Realizing that most transfer decisions were required to be made by July 1, 2004 for the upcoming 2004-2005 school year, the Court had attempted to hold an evidentiary hearing in the early part of 2004. However, the parties requested extensions of time for the hearing. The Court rescheduled the status conference to June 21, 2004 (later reset to June 18th), and postponed the evidentiary hearing to July 12, 2004.

Predictably, this delay left an insufficient amount of time for the Court to resolve noncompliant desegregation efforts that might have occurred prior to the beginning of the upcoming 2004-2005 school year. By then the case had been going on for 26 years. That is not "with all deliberate speed" as the United States Supreme Court stated desegregation should take place. In addition, no matter how good or fast the Court might be, it takes time and thought to research the hundreds, if not thousands, of reported desegregation cases to try and find the appropriate remedies available to the Court and to draft an Order that will direct the parties in the proper direction, and hope that that Order will be obeyed. Therefore, at the time this Court was finally able to hold the evidentiary hearing in mid-July 2004, the Court was fully aware that the School District had already made its transfer decisions for the upcoming year.

The evidentiary hearing was held from July 12, 2004 through July 16, 2004 in Ocala, on the Plaintiff' Motion to Enforce the 1995 Consent Agreement (Doc. No. 129, filed January 23, 2004) and on the School District's Motion for Determination of Unitary Status (Doc. No. 133, filed February 13, 2004). The latter Motion was orally withdrawn during the hearing when the Defendants realized

during the hearing, that not only were they not a unitary system, but also that they had been violating the Court's Order (approving the 1995 Consent Agreement).

On July 16, 2004, the Court entered an Order directing the School District to continue to comply with the 1995 Consent Agreement with the modification that the transfers authorized under the "No Child Left Behind Act" could be granted only if there was no adverse impact on the effects of the desegregation goals of the Consent Agreement on either the sending or receiving schools.

Also, as a result of the parties' stipulation at the July hearing, the 1995 Consent Agreement was modified by the Court in its detailed Order (hereinafter, the "2004 Modified Decree" - Doc. No. 158), entered on August 31, 2004 in an attempt to facilitate the School District's efforts in achieving a unitary system that would provide the best possible educational opportunity for the public school students of Marion County. The Court expressly and methodically outlined detailed requirements in its 2004 Modified Decree, as follows:

### III. STUDENT ASSIGNMENT
**A.     Out-of-Area Transfers:**
   1. The School Board shall immediately reinstate Policy JC: "Student Assignment," as modified and set forth herein.

   2. Policy JC shall apply regardless of the authority under which any other policies to the contrary have been or shall be issued. The other policies shall be null and void.

   3. The School Board will not modify Policy JC without the express approval of the Court.

   4. Policy JC shall take precedence and supercede any other policy because of the constitutional basis upon which it is established, and any transfer that may be authorized by the" No Child Left Behind Act" may only be granted if it would have no adverse impact on the desegregative efforts contained herein. <u>Swann v. Charlotte-Mecklenburg Board of Education</u>, 402 U.S. 1 (1971); <u>Green v. County School Board of New Kent County</u>, 391 U.S. 430(1968); <u>Brown v. Board of Education</u>, 347 U.S. 483 (1954).

     **5.** The School District shall implement the modified "Student Assignment" Policy JC as follows:
        **a.** The School District shall eliminate all out-of-area reassignments based on:
          **(1)** "hardship" (including "working mom")
          **(2)** "sibling reassignment"
          **(3)** "extracurricular activity"
          **(4)** 5th grade/8th grade "senior privilege"

     Obviously, the school year was commencing within a few weeks after the July 2004 hearing. The Court realized that it would not be able to prepare its Order fast enough before the school year began. Consequently, the Court's 2004 Modified Decree entered on August 31, 2004 imposed modifications that would have to apply to transfer decisions made <u>prospectively</u>, and not retroactively. It would not have been practical nor prudent for the Court to require the School District to rescind or reverse its approvals of parents' transfer applications so close after the commencement of the school term. Therefore, the Court did not intend for the 2004 Modified Decree to require the School District to rescind any of its transfer decisions made prior to August 31, 2004 (the date of the Decree) for the 2004-2005 school year.

     Apparently, with the same reasoning in mind, the expert witness testifying for the Plaintiff, Dr. Gordon, said at the May 23, 2005 hearing that it would have caused a hardship if the School District reassigned students after the transfer applications had been approved. Dr. Gordon testified that reassignment of 600-plus students during the school year would have caused chaos even without taking into account the commotion caused by the multiple hurricanes last summer, two of which took place before and after the 2004 Modified Decree which forced the Defendants to close the school system down for the safety of the students and staff as well as leaving the schools accessible as shelters for those who had to evacuate their homes. Dr. Gordon also testified that it would not have

8

accomplished anything. In fact, Dr. Gordon merely opined that it would have been a good idea for the School District to have informed the Court once it realized that the transfers it had approved prior to the July hearing were in noncompliance. However, not only would the Court have been unable to remedy the transfers at that late date, but also the 2004 Modified Decree does not expressly require the School District to so notify the Court. Consequently, the Court finds that the School District's silence regarding the improper prior transfers did not violate the Decree. Moreover, a school district cannot be in violation of a court's decree for transfer decisions made before that court entered the decree. In addition, as will be discussed further below, the School District cannot be found to be in violation for its de minimis number of violations.

A few months later, on October 6, 2004, counsel for the School District filed a Motion to Withdraw, which was granted. Shortly thereafter, the School District's new counsel filed a Semi-Annual Report on October 18, 2004 (Doc. No. 163). On December 15, 2004, the Plaintiff filed a Motion to File its Report Out of Time (Doc. No. 168), claiming that it had miscalculated the reporting time, and attaching its Report (Doc. No. 169), which states that, upon review of the School District's October Report, it concluded that the School District was not in compliance with the 2004 Modified Decree.

The Court has been extremely patient.[6] However, as mentioned above, given this protracted history of delays for almost twenty-seven years, in December, 2004, the Court was compelled to enter an Order to Show Cause why the School District should not be held in contempt for its alleged

---

[6] Dr. Rossell opined that the Court's last Decree was stringent. The reason for that is the Court's attempt to spell out in great detail what Defendants needed to do so that the Court did not have to hold hearings every month to determine the level of compliance, to see what was going on, or if need be, take over the system by becoming a substitute superintendent.

continued violations, and setting the violation matter for an evidentiary hearing on March 1, 2005 (Order, Doc. No. 170, filed on December 16, 2004). Even that hearing, originally scheduled for March 1, 2005, had to be rescheduled to May 23, 2005 (Order, Doc. No. 177) to accommodate the parties once again. The School District filed responses in opposition (Docs. 171, 172, 174), denying any violations since the 2004 Modified Decree. It also filed a Motion for Leave to File a Modified Policy JC (Doc. No. 173, filed on January 31, 2005).

Once again, the Plaintiff filed a Motion for Extension of Time (Doc. No. 178, filed on February 23, 2005), this time for an extension of time to respond to the School District's Motion for Leave to File a Modified Policy JC. Although the School District had no objection to the request for an extension in its Response (Doc. No. 179), it mentioned that the Plaintiff had received its proposed modification to the Policy JC almost four months prior.

On March 1, 2005, the School District filed its Semi-Annual Report, and on April 18, 2005 the Plaintiff filed an Unopposed Motion for Extension of Time to File its 2005 Spring Report (Doc. No. 188), which was granted (Doc. No. 189). Another request for extension for the Spring Report was filed on April 29, 2005 (Doc. No. 193), which was also granted (Doc. No. 196). Along with the request, the Plaintiff filed a Motion to Substitute its attorney because the former attorney, who had been working on this case since August, 1982, retired. Overall, the Court has shown considerable patience and restraint in this case. It appears to the Court that both parties throughout the years, have worked very hard in an effort to reach accommodations to completely dismantle the desegregated school system. Nevertheless, they continue to come up short. The goal of a unitary school system needs to be reached once and for all, and the smartest way to do this is to follow the Court's Orders to the letter, not to change it around because one of the parties thinks it has a better or faster way to

reach that goal. At no time, has this Court been blind to a request from the parties to consider a modification of any orders if asked to do so. That request for a modification might not be granted, but the Court would certainly consider any proposal.

The public school students and citizens of Marion County deserve to have a school system that has achieved unitary status and an end to judicial supervision. A unitary school system and an end to court supervision in Marion County is long overdue. Yet, this Court cannot find that the school system in Marion County has achieved unitary status unless it meets the criteria specifically set by law. It is not what the school's staff, in its discretion, believes a unitary status is, and it is not what the court's personal philosophy is; it is when the facts established under existing law say that the unitary status is achieved. Justice Benjamin Cardozo eloquently explained that:

> "[a judge] is not a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw his inspiration from consecrated principles. .. He is not to yield to spasmodic sentiment, to vague and unregulated benevolence. . . . . Judges have ... the power, though not the right to travel beyond the walls of the interstices, the bounds set to judicial innovation by precedent and custom. Nonetheless, by that abuse of power, they violate the law."

Benjamin N. Cardozo, "The Nature of the Judicial Process," 129, 141 (1921). Neither the judge nor Mr. Burke is a knight-errant and can substitute our own personal views for what the law says must be done.

Article III judges are given the authority to uphold the law and to resolve issues that are brought to them by the litigants in a particular case. They do not go looking for societal problems. As shown by the recent Schiavo cases, it is not what the presiding judge, or members of Congress or the President or the Governor, personally think that determines the outcome. See e.g., Schiavo ex rel Schindler v. Schiavo, 357 F. Supp. 2d 1378 (M.D. Fla. 2005). Instead, everyone must follow the law, including the judge, and the Courts' Orders follow the law and are based on precedence. As

11

stated before, should any party believe that an order needs to be modified, then it should ask the court to modify or vacate its order. But unless and until an order is modified or vacated, it remains enforceable and in full force and effect, and it must be complied with rather than violated. Some people may have good intentions of using their discretion to achieve desegregation in schools, but if their use of discretion violates a court's order, it actually results in a disservice no matter how laudable ones motives are or how difficult it may be to have to tell parents that their transfer requests cannot be honored. Federal judges only have the judicial authority to enter orders that interpret and follow the law for only the issues that the parties to the litigation ask them to resolve, and everyone involved must comply with such law-abiding orders. If the Defendants want to blame anyone for denying a school transfer, they can tell the parents it is the judge's fault.[7] That is a method Defendants can use to take the "heat" off of them. If an explanation is needed as to why the judge did this, all that needs to be said is that Defendants have repeatedly and continually violated Court Orders and this was a way for the judge to try and stop the school system's violations.

Therefore, in accordance with supreme court cases, the district court must continue to supervise desegregation efforts until the school system is able to prove that it has achieved a unitary status.[8] NAACP, Jacksonville Branch v. Duval County School, 273 F.3d 960, 966 (11th Cir. 2001); Lockett v. Bd. of Educ. of Muscogee County, 111 F.3d 839, 842 (11th Cir. 1997) (Lockett II) (citing

---

[7] And if necessary, if this Order is not followed to the letter, the Court will have no hesitancy in addition to sanctioning those who violate the Orders, to take over Mr. Burke's job and require that every out-of-area transfer can only take place upon specific written approval by the Court. However, the Court does not believe that the parties or the parents of the students of Marion County would want this to happen.

[8] A unitary status is determined by a court examining "six areas: (1) students assignments; (2) facilities; (3) faculty; (4) staff; (5) transportation; and (6) extracurricular activities" to see if the defendant has met its constitutional obligation to eliminate the vestiges of *de jure* segregation to the extent practicable. NAACP, Jacksonville Branch v. Duval County School, 273 F.3d 960, 966 (11th Cir. 2001)(citing Green v. County School Board of New Kent County, 391 U.S. 430, 435 (1968)).

Brown v. Bd. of Educ., 349 U.S. 294, 301 (1955)). However, before making its determination as to whether the Court may bring an end to its supervision, the Defendants must first be able to prove that they have "(1) complied in good faith with the desegregation decree, and (2) eliminated the vestiges of prior *de jure* segregation to the extent practicable." Duval County School, 273 F.3d at 966. "A unitary system is one in which there is presently no *de jure* racial segregation, and the vestiges of former *de jure* segregation have been eliminated to the extent practicable." Id., citing Freeman v. Pitts, 503 U.S. 467 (1992). The target is not statistical desegregation nor merely an obsession over mathematical ratios, but rather an equal opportunity to the same education for every student in Marion County as promised in Brown v. Brd. of Educ., 347 U.S. 483 (1954) (Brown I) and 349 U.S. 294 (1955) (Brown II). The Court must be satisfied that the racial composition is not the result of the School District's present or past discriminatory action. Swann v. Charlotte-Mecklenburg Brd. of Educ., 402 U.S. 1 (1971).

In its December 2004 Report, the Plaintiff concluded that the School District was not in compliance with the 2004 Modified Decree because (a) transfers were made in violation of the 2004 Modified Decree, and (b) the School District had not reinstated its Student Assignment Policy JC as Modified. After hearing the evidence presented at the hearing on May 23, 2005, the Court concludes that the Plaintiff did not establish the alleged violations for the following reasons:

(a) The Plaintiff specifically alleges several violations regarding transfers. It claims that the "out-of-area transfer applications" were incomplete and did not provide sufficiently detailed information to explain the reasons for the transfer approvals or denials in violation of 5. 1., at page 10 of the 2004 Modified Decree. Some of these applications did not include written explanations nor supporting documentation for the approval or denial because the person reviewing the applications,

Anthony Burke, Supervisor for Manager and Services Department, had had this job and reviewed applications since 1995. At the 2005 as well as the 2004 hearings, Mr. Burke testified that he would recall the reasons given to him and established by parents in previous years. Also, the Court finds that these violations, if any, applied to transfer decisions made prior to the Court's 2004 Modified Decree.

(b) The Plaintiff also alleges that the School District failed to reflect the required analysis of "racial impact" or "cumulative desegregative effect" in the application approvals and denials in accordance with the 2004 Modified Decree, part III, 5. m., at page 11. However, the Court finds that these violations, if any, apply only to applications reviewed by the School District prior to the 2004 Modified Decree and the transfer forms now used have been modified to include all the information necessary to comply with the 2004 Modified Decree.

(c) The Plaintiff further alleges that the School District continues to grant "administrative necessity" transfers on bases that are prohibited, limited, or not contemplated by the 2004 Modified Decree. Unlike the 1995 Consent Agreement, the 2004 Modified Decree narrowly defines "administrative necessity" as needed "in very rare and exceptional circumstances involving health, safety, well-being, or discipline of a student" under section III. A. 5. e. (6), at page 9. (Compare 1995 Consent Agreement, at 12.) The Plaintiff alleges that the School District approved transfers categorized as "administrative necessities" under circumstances that were not permitted by the 2004 Modified Decree. However, the transfers were approved prior to the August 31, 2004 Modified Decree while the court-approved 1995 Consent Agreement, which was more broad and flexible, was the only binding criteria. Therefore, the Court finds that these transfer approvals that were based on administrative necessity did not violate the 1995 Consent Agreement.

In addition, the Court finds that the applications approved based on "hardship," "sibling reassignment," and "senior privilege" were an extremely small, insignificant amount of violations. Only two "senior privilege" transfers were impermissibly granted after the deadline of July 1, 2004, which violated the 1995 Consent Agreement. Otherwise, the transfers met the criteria of the Consent Agreement. Mr. Burke admits that he approved some transfers which were based on "senior privilege" and "program of study" without proper supporting documentation and, in retrospect, which should not have been approved because the applications came in after the July 1 deadline designated by the 1995 Consent Agreement. However, the parties stipulated to the Court that out of the 1,633 "out-of-area-transfer" applications reviewed and granted, there were, at most, only between 10 to 14 that violated the 1995 Consent Agreement.[9]

Mr. Burke testified candidly that one error he made which violated the 1995 Consent Agreement involved a majority-to-minority transfer, but such mistake was plainly a human error, where he mistakenly had the schools' racial makeup flipped around in his mind, and he transferred in the reverse manner from what he intended. (See Exh. 9, at 157 regarding the Santos Bellview Elementary School.) The Court finds that the occurrence of that error made out of 1,633 transfer applications is certainly excusable and insufficient to find the School District committed an intentional violation.

All in all, the only other possible flaw shown by the Plaintiff would be that the forms used and reasons given on those forms for the transfer decisions made prior to the Modified Decree (i.e., while decisions were made before July 1, 2004 for the 2004-2005 school year), could be found as not to

---

[9] But this demonstrates that even though small in number, we are dealing with human beings and mistakes are made. What the Court is trying to achieve is 100% compliance with its Orders.

15

be "fully detailed" as required by the 1995 Consent Agreement (see pp. 12-13).

Mr. Burke further testified that the July 2004 hearing gave him a new understanding and appreciation, possibly for the first time, about what little authority and discretion he actually may exercise in making transfers permissible. He also testified that since the hearing in July 2004, he has strictly, rigorously, and exactly complied with the 2004 Modified Decree entered in August 2004 for all transfer decisions he made thereafter. He also testified that he revised the transfer application forms to improve them and in an effort to comply with the 2004 Modified Decree. As for the transfer applications for the 2005-2006 school year, he has not granted or denied them because he is waiting for direction from this Court based on this Order regarding the approval of the Policy JC and its findings on the contempt issue addressed at the May 23, 2005 hearing. If he has made any transfers, they shall immediately be vacated and reconsidered in accordance with this Order. All transfers for the 2005-2006 school year and subsequent school years should be in accordance with the July 16, 2004 Order, the 2004 Modified Decree, and this June 8, 2005 Order. Through his testimony and demeanor, Mr. Burke instilled confidence that he will be adhering to the Court's Orders in good faith and as best as humanly possible.

Regarding the transfer violations alleged by the Plaintiff, the Court finds that the transfer decisions - which the Plaintiff relies upon for its position that the School District was in noncompliance - were transfer decisions made prior to the 2004 Modified Decree entered on August 31, 2004. For the reasons given above, the Court will not deem these transfer decisions to be in violation of the 2004 Modified Decree.

(d) With respect to the Policy JC, the 2004 Modified Decree does not dictate any precise deadline for the School District to obtain the Court's approval for a modification of the Policy.

Instead, Part III A.3. of the 2004 Modified Decree only requires it to obtain the Court's approval prior to modifying the Policy. The School District had drafted a proposed modification which it shared with the Plaintiff. On January 31, 2005, the School District filed a Motion for Leave to Supplement Modified Policy JC (Doc. No. 173).

Given that the School District was in turmoil last fall with several back-to-back hurricanes causing the schools to be used as shelters, the Court finds that its timing in drafting modifications to the Policy JC and in requesting court approval is reasonable. Therefore, the Court does not find the School District to be in violation of this requirement either. Between August 31, 2004 and January 2005, the parties were apparently trying to reach an agreement regarding modifications to the Policy JC. According to the parties' pleadings recently filed (Doc. Nos. 205, 206, 208, filed on June 3 and June 6, 2005), the parties apparently were able to agree to all but one issue, which involves the modifications of the Policy JC that involves the senior privilege reassignments.

The "purpose of federal supervision is not to maintain a desired racial mix at a school" nor to exclusively focus on "minor statistical differences" or "rigid racial ratios." NAACP, Jacksonville Branch v. Duval County School, 273 F.3d 960, 966 (11th Cir. 2001); see also The Thomas County Branch for the NAACP v. City of Thomasville School District, 299 F. Supp.2d 1340, 1350 (M.D. Ga. 2004). Therefore, the issue of whether to permit juniors to remain with their graduating class by granting "senior privileges" should be viewed as an attempt to provide quality educational experience equally to all students in that predicament, rather than excluding certain juniors from that privilege only because they wanted to remain in the school which they had been previously transferred to on other bases that are no longer applicable. The Court is not persuaded by the distinction between the juniors applying for the senior privilege. Therefore, the Court will allow the modifications made to

the Policy JC, including the modifications to the senior privilege transfers, as proposed by the School District and submitted with its Response as Exhibit B (Doc. No. 205).

The Plaintiff and Defendants are represented by new attorneys. For now, it appears to the Court that the new attorneys in this case have an amicable working relationship, as the attorneys who withdrew did, and that they would work diligently together toward achieving an end to this case. Therefore, the Court looks forward to the parties to resolve their disputes and achieve the unitary status so the court can withdraw its supervision with the confidence that the School District will continue to provide a unitary system for public school students of Marion County. The Court looks forward to the School District's fulfillment of its continuing desegregation obligations and the ultimate resolution of this case.

In conclusion, the evidentiary hearing on the Order to Show Cause held on May 23, 2005 provided the parties with an opportunity to prove whether the School District intentionally violated the 2004 Modified Decree as alleged by the Plaintiff. The Plaintiff showed that a small number, perhaps 15, of violations of the 1995 Consent Agreement were made out of the 1,633 applications. However, Plaintiff failed to show that the School District intentionally or deliberately violated this Court's 1995 Consent Agreement. The Plaintiff also submitted no evidence that the School District has violated the 2004 Modified Decree since the time it was entered on August 31, 2004. The Accordingly, it is

**ORDERED AND ADJUDGED** that

1) The Order to Show Cause is hereby **DISCHARGED**;

2) The School District's Motion for Leave to File Supplement Modified Policy JC (Doc. No. 173, filed on January 31, 2005) is **GRANTED,** and the modifications to the Policy JC proposed by

the School District and submitted with its Response as Exhibit B (Doc. No. 205) is adopted and enforceable from this date forward;

3) If the Defendants have made any transfer decisions for the 2005-2006 school year, they shall be immediately vacated and re-considered in accordance with the July 16, 2004 Order, the 2004 Modified Decree, and this June 8, 2005 Order; and

4) In all subsequent school years, all transfer decisions shall be made in accordance with the Orders and Decree listed in paragraph 3 above.

**DONE AND ENTERED** at Jacksonville, Florida, this 8th day of June, 2005.

HARVEY E. SCHLESINGER
United States District Judge

Copies to:

Tamara H. Kassabian, Esq., U.S.DOJ
Michael W. Kirk, Esq.
David M. Wells, Esq.
Christine Milton, Esq.